IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

AVIS RENT A CAR SYSTEM, LLC,  :
et al.,

                                     Case No. 3:12-cv-399

           Plaintiffs,          :

      v.

                                    JUDGE WALTER H. RICE

CITY OF DAYTON, OHIO,       :

           Defendant.

---

DECISION AND ENTRY OVERRULING THE MOTION OF PLAINTIFFS
AVIS RENT A CAR SYSTEM, LLC AND BUDGET RENT A CAR
SYSTEM, INC., FOR ATTORNEYS' FEES (DOC. #82) AND THE
MOTION OF THE ENTERPRISE PLAINTIFFS FOR ATTORNEYS' FEES
(DOC. #83)

---

Pending before the Court are the Motion of Plaintiffs Avis Rent A Car

System, LLC and Budget Rent A Car System, Inc., for Attorneys' Fees (Doc.#82)

and the Motion of Enterprise Plaintiffs' for Attorneys' Fees (Doc. #83), filed

pursuant to Rule 54(d)(2) of the Federal Rules of Civil Procedure. For the reasons

set forth below, the motions are OVERRULED.

I.    **BACKGROUND**

Avis Rent A Car System, LLC and Budget Rent A Car System, Inc. (the

"Avis Plaintiffs"), and Enterprise RAC Company of Cincinnati, LLC, dba Enterprise

Rent-A-Car and Vanguard Car Rental USA, LLC, dba National and Alamo (the

"Enterprise Plaintiffs"), are rental car companies, or rent-a-car agencies ("RACs"),

that lease office space and parking facilities from the City of Dayton ("City") at the James M. Cox International Airport ("Airport") in order to conduct business there. This litigation arose out of a dispute that originated in the following agreements.

### A. The Concession Agreements

On December 13, 2006, each Plaintiff entered into a Non-Exclusive Rental Car Concession and Lease Agreement ("Concession Agreement ") with the City that governed the terms and conditions under which each RAC could operate at the Airport. Doc. #83-1.[1] The Concession Agreements allocated to each RAC a particular number of "Ready/Return parking spaces," where customers could pick up and return rental cars. *Id.* at 5. The Concession Agreements were in effect for a defined term of three years and expired on December 31, 2009. *Id.* The original version of each Concession Agreement provided for a maximum of three one-year extensions of the expiration date, but a May 1, 2009, amendment instead implemented one three-year extension, extending the agreements until December 31, 2012. Doc. #58-6 at 38.

### B. The Memorandum of Understanding

On May 2, 2008, Plaintiffs and the City entered into Memorandum of Understanding ("MOU"). Verified Compl. Ex. 1 (Doc. #1-1). The MOU

---

[1] For purposes of this litigation, the terms of the Concession Agreements are materially identical. For convenience, citations to the Concession Agreement will be only to Exhibit 1 of Enterprise's Motion for Attorney Fees. Doc. #83-1. The other parties' Concession Agreements are attached as Exhibit 2 (Doc. #1-2) and Exhibit 3 (Doc. #1-3) to the Complaint (Doc. #1).

2

memorialized 1) the City's intent to build a three-story parking garage ("Garage") at

the airport, 2) the parties' agreement that relocating the Ready/Return parking

spaces to the ground floor of the Garage was both "necessary and beneficial,"

under a deadline imposed by the Federal Aviation Administration due to the

construction of a new air traffic control tower, and 3) the agreed use of revenue

from Customer Facility Charges (" CFC") to fund "the design, construction, and

operation of the Garage at the Airport." *Id.* at 1. According to the MOU, the

entire first floor of the Garage would contain approximately 700 parking spaces.

*Id.* at 2. The first floor was to be entirely allocated to the RACs for their

Ready/Return area and parking. *Id.* Public parking spaces would occupy the top

two floors of the Garage. *Id.*

### C. The Ready/Return Agreement

On March 4, 2009, in anticipation of the construction of the Garage, the

City entered into a new lease agreement, the Rental Car Ready/Return Agreement

("Ready/Return Agreement") with each of the Plaintiffs.[2] Doc. #83-2. Each

Ready/Return Agreement recognized that the MOU had "set forth the parties'

commitments and understandings regarding the construction of [the Airport]

Parking Garage" and the operation of the RACs pursuant to the Concession

Agreements. *Id.* at 2. The purpose of the Ready/Return Agreement was "to set

---

[2] As with the Concession Agreement, citations to the Ready/Return Agreement
will only refer to the Ready/Return Agreement between the City and Enterprise.
Doc. #83-2.

forth the terms and conditions for [each RAC's] lease and use of the ground level of the Parking Garage as a Ready/Return" area, stating that the new agreement "set forth the terms and conditions for the lease of space in the Parking Garage, including the use of [the CFCs] for the design, construction and operation of the Garage at the Airport." *Id*.

The Ready/Return Agreement allocated 700 spaces to the RACs for Ready/Return, while reserving the second and third floors for public parking. *Id.* at 4. Article V of the Ready/Return Agreement, which described its "Term," stated:

> **This Agreement is effective from the date of complete execution by the parties. This Agreement shall expire twenty (20) years from the Garage Completion Date, unless earlier terminated as set forth in Article XI or Article XII. In addition, this Agreement shall automatically terminate upon the date of termination of the Concession Agreement.**

*Id.* at 7.

Article XI, "Termination by City," provided a list of twelve specific "Events of Default" that would allow the City to voluntarily terminate the Ready/Return Agreement. *Id.* at 16-17. Examples included a RAC's failure to perform under the Ready/Return Agreement, discontinuation or abandonment of its airport operations, a lack of required insurance, or insolvency. *Id*. Similarly, Article XII, "Termination by Operator," listed specific conditions that triggered a RAC's right to terminate the Ready/Return Agreement, such as a court injunction or a governmental restriction on the Airport's operation. *Id.* at 17-18.

4

**D.    Facts Pertinent to Plaintiffs' Allegations of "Bad Faith"**

Iftikhar Ahmad was the City's Director of Aviation from October or November, 2006, until May, 2010.  Ahmad Dep. at 16, 19 (Doc. #44 at 4,5).  He negotiated the terms of the Ready/Return Agreements on behalf of the City with the intention of giving the RACs a 20-year lease term on the first floor of the Garage in exchange for using the revenue from the CFCs to fund the Garage's construction.  *Id.* at 109-112 (Doc. #44 at 28).  Furthermore, the Concession Agreements were negotiated to have only three one-year extensions with the intention that the parties would eventually renegotiate and enter into successor agreements with terms that would correspond to the 20-year lease term of the Ready-Return Agreement.  *Id.* at 121-22 (Doc. #44 at 31).  The Garage was completed on August 1, 2010.  Compl. ¶ 29 (Doc. #1 at 6); Answer ¶ 29 (Doc. #17 at 2).

After Ahmad left Dayton, Terrence Slaybaugh became the City's Director of Aviation in March, 2011.  Slaybaugh Dep. at 21 (Doc. #50 at 6).  He first reviewed the Ready/Return Agreements in early 2012.  *Id.* at 445 (Doc. #51 at 42).  At that time, he came to the conclusion that they were governed by a 20-year term, and his staff shared this understanding.  *Id.* at 445-46 (Doc. #51 at 42).  However, Director Slaybaugh believed that the Ready/Return Agreements were "a bad deal" for the City because he saw them as a giveaway of "City assets [the first floor of the Garage] to private companies for twenty years rent free."  *Id.* at 481 (Doc. #51 at 51).  At some time between April and August, 2012, he

asked the City's attorney, Suzanne Beck, "to look for ways for us to – to be able to get out of that agreement." *Id.* at 447 (Doc. #51 at 42). Director Slaybaugh "relied on . . . the City's legal counsel on the final determination on how Article 5, [describing its Term], could be applied to the Ready/Return Agreement." Slaybaugh Dep. at 413 (Doc. #51 at 34).

Because the Concession Agreements were set to expire on December 31, 2012, the RACs believed that the City would begin the process of negotiating successor agreements. On February 7, March 8, and May 1, 2012, Enterprise representative Barb Mathey emailed Director Slaybaugh about scheduling meetings with the RACS to negotiate successor agreements to the Concession Agreements. Avis Mot. Summ. J. Ex. O (Doc. #40-2). He responded by stating that his office would be "sending out a schedule by mid-June" to obtain information from the RACs regarding the "RFP process," in reference to Requests for Proposals, which was the process for negotiating new agreements. *Id.* He was "confident we can get it done by fall and get agreements in place by December." *Id.*

However, the schedules were never sent out and the City never began the RFP process. Slaybaugh Dep. at 539-41 (Doc. #51 at 65-66). Instead, Director Slaybaugh recommended that the City implement a permit process that would regulate the RACs' use of the Garage. In an August 27, 2012, Memorandum to City Manager Timothy H. Riordan, Director Slaybaugh stated:

> At the end of 2012 the Rental Car Concession Agreements expire. After a review of the agreements and the activities of the current [RACs] operating at the Airport[,] I am recommending that the City

6

end the practice of multi-year concession agreements and enter into short term Permits with the RACs.  This action will allow the City to terminate a Ready/Return Agreement with the RACs that gives them the use of the first floor of the garage rent free.  This effort will allow the City to return a large number of first floor garage parking spots (350 to 400) to public parking for our business customers.

. . .

The current Ready/Return Agreement is in effect until 2030.  The City can let the Ready/Return Agreements expire at the end of 2012 by not renewing the Concession Agreements with the RACs.

. . .

I am proposing to let the five year Concession Agreements expire at the end of 2012.  This will let the Ready/Return Agreements expire on the same date.  The City will then enter into one year Permits with the RACs.

Doc. #83-15 at 1.

The City Manager recommended that Director Slaybaugh meet with each of the City Commissioners and the Mayor to explain the proposed permit process to them.  Slaybaugh Dep. at 202 (Doc. #50 at 52).  The meetings were held in October, 2012.  *Id.* at 221 (Doc. #50 at 56).  Director Slaybaugh did not inform the RACs of the plan to replace the negotiated Concession Agreements with the permit process during this time, stating that he "chose not to go back to the [RACs] until I had clear direction and approvals from the City administration and the City Commission."  *Id.* at 221-22 (Doc. #50 at 56-57).

On November 8, 2012, Director Slaybaugh sent the RACs a memorandum regarding the City's intention to replace the negotiated Concession Agreements with permits.  Relevant portions of the memorandum stated:

The [Concession Agreements] expire on December 31, 2012, and accordingly the Rental Car Ready/Return Agreements automatically terminate. The City maintains operating permits with the airlines and is moving in the direction of permits for other user groups, including [RACs]. To this end, the Dayton City Commission will be voting on three On-Airport Rental Car Ordinances. The first reading of each Ordinance will occur at the City Commission meeting on Wednesday, November 14, 2012. These Ordinances will establish Rules and Regulations . . . the Fees and Charges . . . and establish the 2013 Model Permit [for the RACs' operation at the Airport]. The Draft Permit and Draft Rules and Regulations are attached for your review.

. . .

Upon passage of the Ordinances by the City Commission on November 21, 2012, Permits will be mailed to all existing [RACs] for signature. Companies interested in signing a Permit must notify Beth Vincent, Airport Properties Manager in writing . . . no later than 4:00 p.m. on Wednesday, December 5, 2012. Signed permits must be received by the City no later than 4:00 p.m. on Friday, December 14, 2012. . . . Please note that the Ready/Return space in the parking garage has been reduced.

Avis Mot. Summ. J. Ex U. (Doc. #41-4).

On November 28, 2012, the City Commission passed the Ordinance, thereby establishing a permit process to govern the RAC's operations at the Airport. *Id*. Ex. Y (Doc. #42-2). To comply with the permit process and obtain a permit that would allow its operation, a RAC would have to annually pay 1) a "Base Ready/Return Block Fee" of $39,000; 2) a "Base Counter Fee" of $45,000; and 3) a "Permit Fee" of 10% of the RAC's gross revenue for each fiscal year of the Permit's validity. *Id*.

8

### E.    Relevant Procedural Background

The same day the Ordinance passed, the Avis Plaintiffs filed suit against the City, alleging that it had repudiated the Ready/Return Agreements by declaring their imminent expiration and instituting the permit process. Doc. #1. They sought preliminary and permanent injunctive relief to enforce their rights under the Ready/Return Agreements, as well as a declaratory judgment specifying the parties' legal rights and obligations. *Id*. at 9-12. On December 3, 2012, the Enterprise Plaintiffs also filed suit against the City, making the same allegations and seeking similar relief. Case No. 3:12-cv-405 at Doc. #1. The same day, Plaintiffs filed Motions for Temporary Restraining Orders, seeking an order that would require the City to continue to abide by the Ready/Return Agreements and prevent it from implementing the permit process or requiring Plaintiffs to vacate any part of the Garage. Doc. #3; Case No. 3:12-cv-405 at Doc. #5. At a phone conference held on December 5, 2012, the City agreed to stay the permit process and maintain the status quo of its existing agreements with Plaintiffs, pending the resolution Plaintiffs' requests for preliminary injunctive relief.[3] Doc. #64.

After a period of expedited discovery, the parties filed Motions for Summary Judgment. Avis filed its motion on June 4, 2013. Doc. #37. Enterprise filed its

---

[3] Plaintiffs filed two separate lawsuits against the city, Case No. 3:12-cv-399 and Case No. 3:12-cv-405. The cases were consolidated under Rule 42(a)(2) of the Federal Rules of Civil Procedure on August 22, 2013, into Case No. 3:12-cv-399. Doc. #81. All citations herein are to the docket of the consolidated case, Case No. 3:12-cv-399, unless express reference is made to Case No. 3:12-cv-405.

motion on June 18, 2013, in Case No. 3:12-cv-405 at Doc. #38. The City filed a

Cross-Motion for Summary Judgment on June 28, 2013. Doc. #58.

Plaintiffs filed Amended Complaints on June 10, 2013 (Case No. 3:12-cv-

405 at Doc. #37), and July 15, 2013 (Doc. #65). In both pleadings, Plaintiffs

asserted additional claims under the caption "Bad Faith," based on allegations that

the City had acted in bad faith by refusing to negotiate a successor to the

Concession Agreement, declaring that the Ready/Return Agreements to have

terminated after 2½ years of their 20 year terms, and attempting to implement the

permit process. *Id.*

In its Decision and Entry of July 24, 2013, the Court sustained Plaintiffs'

Motions for Summary Judgment and overruled the City's Cross-Motion for

Summary Judgment. Doc. #77. Therein, the Court rejected the City's argument

that the expiration of the Concession Agreements automatically terminated the

Ready/Return Agreements, stating that:

> the Ready/Return Agreement expressly states a twenty-year duration,
> subject to certain conditions for termination. A shorter duration
> cannot be supplied by implying that the expiration of the Concession
> Agreement functions as a termination of the Ready/Return Agreement,
> when the terms are clearly and unambiguously used for distinct
> purposes in both agreements. Thus, the Court's construction aligns
> with the Plaintiffs' view that the Ready/Return Agreement defined a
> lease term of twenty years, and that the December 31, 2012,
> expiration date of the Concession Agreement did not terminate the
> Ready/Return Agreement. Contrary to the City's assertions, the
> December 31, 2012, expiration date of the Concession Agreement
> had no effect on the twenty-year lease term of the Ready/Return
> Agreement, other than to provide the City with a manufactured
> justification for implementing the permit process. The Court
> concludes that the City's disregard of its obligations under the

10

> twenty-year term of the Ready/Return Agreement, and its implementation of a permit process to replace its governing terms, constituted a breach of the Ready/Return Agreement by which it was bound.

*Id.* at 33-34.

On August 22, 2013, the Court filed a Decision and Entry dismissing Plaintiffs' claims for "bad faith" because a bad-faith breach of contract claim is not cognizable under Ohio law as a free-standing cause of action. Doc. #81 at 5 (citing *Lakota Local Sch. Dist. v. Brickner*, 671 N.E.2d 578, 583 (Ohio Ct. App. 1996)). Rather, bad-faith conduct by a breaching party may justify an award of attorneys' fees as costs. *Id.* (citing *SST Bearing Corp. v. Twin City Fan Co.*, 2012 WL 2053315, 2012-Ohio-2490 (Ohio Ct. App. June 8, 2012)). The Court further stated that "Only if Plaintiffs are able to show, by the greater weight of the evidence, a degree of bad faith conduct by Defendant that an Ohio court might consider sufficiently egregious to justify an award of attorneys' fees, will the Court then consider, purely at its discretion, such an award." *Id.* at 7-8. Accordingly, the Court ordered Plaintiffs to file motions under Rule 54(d)(2) to preserve their right to request attorneys' fees while the City pursued an appeal of the Court's judgment in favor of Plaintiffs, which the Court ordered the Clerk to enter forthwith. *Id.* at 9.

On September 5, 2013, Plaintiffs filed Motions for Attorneys' Fees. Doc. #82 & #83.

11

On September 11, 2013, the Clerk entered the Court's Judgment in favor of Plaintiffs and against the City on Plaintiffs' breach of contract claims, with the following declaration:

1. The twenty-year lease term of each Plaintiffs' Ready/Return Agreement commenced on August 1, 2010, the Garage Completion Date, and will terminate on July 31, 2030;

2. Accordingly, each Plaintiffs' Ready/Return Agreement did not terminate on December 31, 2012;

3. The City and all Plaintiffs are bound by each Ready/Return Agreement to which they are a party, subject to any future amendment or successor agreements negotiated in good faith by the parties; and

4. The City is enjoined from instituting a permit process to replace its existing Ready/Return Agreements with all Plaintiffs until the expiration of said agreements on July 31, 2030.

Doc. #85 at 2.

On September 13, 2013, the City filed a Notice of Appeal.  Doc. #86.

On August 19, 2014, the Sixth Circuit Court of Appeals affirmed the Court's decision.  Doc. #89.

On October 27, 2014, Plaintiffs renewed their Motions for Attorneys' Fees. Doc. #91.  On November 26, 2014, they filed Supplemental Memoranda in Support of their motions that quantified their attorneys' fees and costs.  Doc. #92 & #93.  The Avis Plaintiffs claimed $683,006.33, based on $655,351.40 in attorneys' fees and $27,654.93 in costs.  Doc. #92 at 2.  The Enterprise Plaintiffs claimed $597,011.52, based on $554,157.94 in attorneys' fees and $42,853.58 in costs.  Doc. #93 at 2.

12

On December 24, 2014, the City filed a Memorandum in Opposition to Plaintiffs' Motions for Attorneys' Fees. Doc. #94. Plaintiffs filed Reply Briefs on January 20, 2015. Doc. #96 & #97. Accordingly, the matter has been fully briefed and is ripe for the Court's ruling.

## II.    ANALYSIS

Plaintiffs have filed their Motions for Attorney Fees pursuant to Rule 54(d)(2) of the Federal Rules of Civil Procedure. Under Rule 54(d)(2)(A), "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." The rule "creates a procedure but not a right to recover attorneys' fees." *MRO Commc'ns, Inc. v. Am. Tel. & Tel. Co.*, 197 F.3d 1276, 1280 (9th Cir. 1999) (citing Fed. R. Civ. P. 54 advisory committee's note). Where, as here, the Court's jurisdiction is based on the parties' diversity of citizenship, any right to recover attorneys' fees is a question of state law. *Hometown Folks, LLC v. S & B Wilson, Inc.*, 643 F.3d 520, 533 (6th Cir. 2011); *see also Auto. Support Grp., LLC v. Hightower*, 503 F. App'x 411, 421 n.5 (6th Cir. 2012) ("State rules governing attorney fee awards are generally considered to be substantive law and therefore apply in federal court diversity actions under the *Erie* doctrine"). Thus, Ohio law must provide the basis for any award of attorneys' fees to Plaintiffs.

Ohio follows the "American Rule," which, as a general principle, does not allow a prevailing party to recover attorneys' fees from the losing party. *Wilborn v. Bank One Corp.*, 2009-Ohio-306, ¶ 7, 906 N.E.2d 396, 400 (Ohio 2009). The

13

Ohio Supreme Court has recognized three exceptions to the American Rule. *Id.* First, attorneys' fees are available if authorized by statute. *Id.* Second, "so long as the fees awarded are fair, just and reasonable," an Ohio court will enforce a contractual fee-shifting clause that awards attorneys' fees to a prevailing party. *Nottingdale Homeowners' Ass'n v. Darby*, 514 N.E.2d 702, 707 (Ohio 1987). Third, "when the prevailing party demonstrates bad faith on the part of the unsuccessful litigant," it may recover attorneys' fees at the discretion of the trial court. *Wilborn*, 906 N.E.2d at 400; *SST Bearing Corp. v. Twin City Fan Co.,* 2012 Ohio-2490 ¶ 29, 2012 WL 2053315 (Ohio Ct. App. June 8, 2012).

Plaintiffs seek attorneys' fees under the third exception, arguing that Defendant breached its contracts with them in bad faith. Doc. #82 & #83. In response, Defendant makes the legal arguments that such fees are unavailable as a matter of law in Ohio, as well as the fact-based argument that it did not act in bad faith. Doc. #94 at 8-18. Because the parties disagree as to whether the fees that Plaintiffs seek are even available under Ohio law, the Court must first resolve this question before it can consider Plaintiffs' argument that Defendant breached their contracts in bad faith.

### A. Under Ohio law, may a court award attorneys' fees to a prevailing party based on a bad-faith breach of a contract?

The City argues that "this Court should deny Plaintiffs' Motions because the Sixth Circuit, applying Ohio law, has held that 'the bad faith exception to the American Rule does not allow an award of attorney fees based only on bad faith in

14

the conduct giving rise to the underlying claim.'" Doc. #94 at 9 (citing *Shimman v. Int'l Union of Operating Eng'rs*, 744 F.2d 1226, 1233 (6th Cir. 1984)). However, the City's description belies the claims at issue in *Shimman*, the law applied by the Sixth Circuit, and the effect of the holding it quotes. In *Shimman*, the plaintiff had previously prevailed in an appeal affirming the compensatory damages, punitive damages, and attorneys' fees awarded to him at trial for a labor union's violation of federal labor laws and the Ohio common law of assault and battery. *Id.* at 1228. He then applied for an additional fee award for the attorneys' fees he accrued during the appeal. *Id.* The Sixth Circuit reversed the trial court's determination that the plaintiff was also entitled to the additional attorneys' fees. *Id.* at 1238.

With regards to his federal claim, the plaintiff argued that the "bad-faith" exception to the American Rule applied to his federal claim under the Labor-Management Reporting Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 411(a). *Id.* at 1228. The Sixth Circuit framed the issue as "whether an award of appellate attorney fees is allowable where the defendants' acts giving rise to the underlying LMRDA cause of action were malicious and in bad faith." *Id.* at 1229. In its analysis, the Sixth Circuit surveyed the historical development of the bad faith exception to the American Rule in Supreme Court opinions, noting that although the "exception is firmly established in Supreme Court precedent, its limits are not precisely defined." *Id.* at 1230. It identified three categories of bad faith conduct where federal courts had applied the exception: "(1) bad faith occurring during the

15

course of the litigation; (2) bad faith in bringing an action or in causing an action to be brought; and (3) bad faith in the acts giving rise to the substantive claim." *Id.* However, it found no support in the Supreme Court's opinions for the third category. *Id.* at 1230-1234 (discussing *Vaughan v. Atkinson*, 369 U.S. 527 (1962), *Hall v. Cole*, 412 U.S. 1 (1973), and *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240(1975)). This analysis, and the holding that "the bad faith exception to the American Rule does not allow an award of attorney fees based only on bad faith in the conduct giving rise to the underlying claim," applied only to the plaintiff's federal claim under the LMRDA. *Id.* Furthermore, *Shimman* interpreted and applied the bad faith exception to the American Rule under federal law, not Ohio law. *Id.* Here, the issue is not whether to award attorneys fees for bad faith conduct giving rise to a federal claim, nor is the Court applying the bad faith exception under federal law. As discussed, the Court must apply state law to determine whether Plaintiffs are entitled to attorneys' fees.[4] Thus, the holding quoted by the City does not control.

Another *Shimman* holding discussed Ohio law, but it is also inapposite. There, the Sixth Circuit held that Ohio law did not provide a basis for the appellate attorneys' fees that the trial court had awarded after affirmance of the original judgment in the plaintiff's favor on his common law assault and battery claims, as

---

[4] *Shimman* would preclude an award of attorneys' fees to Plaintiffs based on pre-litigation bad-faith conduct if they had brought federal claims against Defendant. This is an obvious and significant difference between the bad-faith exception under Ohio law and the bad-faith exception under the federal law in this Circuit.

16

it could find no "Ohio decision awarding fees incurred on appeal" to support the additional fee award. *Id.* at 1233 n.11, 1237-38. In this case, the issue is not whether Plaintiffs are entitled to their appellate attorneys' fees for successfully defending a tort claim. Simply put, no *Shimman* holding reaches the issue of whether Ohio law allows Plaintiffs to seek attorneys' fees for the City's alleged pre-litigation bad faith conduct in breaching the Ready/Return Agreement.

The City also argues that Plaintiffs' motion should be denied as a matter of law because the Ohio Supreme Court has never held that attorneys' fees are recoverable for a breach of contract in bad faith. Doc. #94 at 8-9. It cites *Ketcham v. Miller*, 136 N.E. 145 (Ohio 1922), as standing for the proposition that "a claim for bad faith breach of contract is not recognized by the Ohio Supreme Court." *Id*. However, *Ketcham* actually held that "[p]untive damages are not recoverable in an action for breach of contract." 136 N.E. at 146, para. 2 of the syllabus. The case does not discusss whether an Ohio court court may award attorneys' fees as costs in a contract action because of the breaching party's bad-faith conduct. Attorneys' fees were not at issue in *Ketcham*, which affirmed the reversal of a trial court that had treated a contract action as a tort and instructed the jury to consider both compensatory and punitive damages. 136 N.E. at 147. *Ketchum*'s syllabus states that allegations that a breach is "unlawful, willful, wanton, and malicious" do not transform a contract action into a tort, and that "[p]unitive damages are not recoverable in an action for breach of contract." *Id.*at 146 (paragraphs 1 and 2 of the syllabus). Here, in contrast, Plaintiffs brought only

17

claims for breach of contract, and they did not seek punitive damages as a remedy. Their claims, which were resolved on summary judgment, did not go to trial, so there is no basis to apply *Ketcham*'s warning against treating a breach of contract claim as a tort by instructing a jury to consider punitive damages.

Even if *Ketchum* could be interpreted to stand for the proposition that "a claim for bad faith breach of contract is not recognized by the Ohio Supreme Court," as Defendant asserts, the issue is not whether such a cause of action exists under Ohio law. The Court has already recognized that a "bad faith" breach of contract claim "is not cognizable under Ohio law as a free-standing cause of action, as 'good faith is part of a contract claim and does not stand alone." Doc. #81 at 5 (quoting *Lakota Local Sch. Dist. v. Brickner*, 671 N.E.2d 578, 584 (Ohio Ct. App. 1996)). For that reason, the Court dismissed the "bad faith" breach of contract claims in the Plaintiffs' Amended Complaints. Plaintiffs sought attorneys' fees as damages in those claims, and attempted to plead them as separate causes of action from their previously-pled breach of contract claims. Because Plaintiffs could not seek attorneys' fees as damages, but could pursue them as costs, the Court dismissed the "bad faith" claims and ordered them to file motions under Rule 54(d)(2) instead. Thus, the issue is whether, under Ohio law, a court may award attorneys' fees *as costs* due to the losing party's bad-faith breach of contract.

The City argues that because no Ohio Supreme Court opinion expressly holds one way or the other on this issue, the Court should overrule Plaintiffs' motions as a matter of law. Doc. #94 at 8. However, although "the federal court

18

must apply state law in accordance with the controlling decisions of the highest court of the state," the application of state substantive law does not require that the state's highest court have specifically addressed the question before the federal court. *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). "If the state's highest court has not addressed the issue, the federal court must attempt to ascertain how that court would rule if it were faced with the issue." *Id.* at 1181. To do so, a court "may use the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the 'majority' rule in making this determination." *Id.* (citing *Grantham & Mann v. American Safety Prods.*, 831 F.2d 596, 608 (6th Cir.1987)).

For the following reasons, the Court believes that the Ohio Supreme Court would recognize the exception to the American Rule for attorneys' fees based on bad faith conduct giving rise to a breach of contract claim. First, as the following survey demonstrates, a number of Ohio's Courts of Appeals have affirmed such awards in contract cases where no tort or punitive damages provided the basis for such fees.[5] In *SST Bearing Corp. v. Twin City Fan Co.,* 2012 Ohio-2490, 2012

---

[5] Two of the cases cited by Plaintiffs awarded attorneys' fees under other exceptions to the American Rule, and are therefore not considered persuasive authority on this issue. Doc. #82 at 10; Doc. #83 at 4. In *Moro v. Abdel-Rahman*, 2005-Ohio-1022, 2005 WL 564068 (Ohio Ct. App. Mar. 10, 2005), the Tenth District Court of Appeals affirmed an award of attorneys' fees under Ohio Rev. Code § 2323.51(B)(1), which allows such an award to "any party adversely

WL 2053315 (Ohio Ct. App. June 8, 2012), a parts supplier sued a manufacturer of industrial fans for breaching a sales contract. Ohio's First District Court of Appeals affirmed the award of attorneys' fees for bad faith conduct, based on findings that the fan manufacturer had used the seller's offered "price to obtain leverage with other competitors,"attempted to obtain the seller's trade secrets, repudiated the sales contract before testing the allegedly defective products, canceled orders for non-defective products, and refused to give the seller the chance to cure potential defects. *Id.* ¶ 29. For these reasons, "[t]he trial court was well within its discretion to award attorneys' fees on bad faith grounds." *Id.*

Bad faith conduct also encompasses actions designed to punish another party. *Dodson v. Maines*, 2012-Ohio-2548 (Ohio Ct. App. June 8, 2012). *Dodson* involved an unjust enrichment claim brought by a daughter against her father. *Id.* Under Ohio law, "claims for unjust enrichment sound in contract rather than tort." *Id.* ¶ 38 (quoting *Complete Gen. Constr. Co. v. Koker Drilling Co.*, 2002-Ohio-4778 ¶ 28 n.1 (Ohio Ct. App. Sept. 12, 2002)). The daughter had bad credit and lived with her children in a rented duplex. *Id.* ¶ 2. Wishing his grandchildren to

---

affected by frivolous conduct." Although the defendant's "bad faith behavior and frivolous litigation conduct" included terminating a contract "with no legal and factual basis," statutory authority provided the basis for the award. In *Schiavoni v. Roy*, the trial court awarded attorneys' fees to a sister whose brother had "pilfered" the assets of his mother's estate, citing the bad faith exception to the American Rule. However, the Ninth District Court of Appeals upheld the fee award under Ohio Rev. Code § 2113.36, which allows for "reasonable attorney fees paid by the executor or administrator . . . as a part of the expenses of administration" of an estate. Both cases affirmed the attorneys' fee awards based on a statute, which is not the exception to the American Rule at issue in this case.

have "a suitable and stable home," the father used his good credit to purchase a single family home, with the deed and mortgage in his name, where his daughter and her children could live.  *Id.*  Although there was no written agreement between them, the trial court found that the parties had agreed that the daughter was responsible for paying "all mortgage payments, taxes, insurance, utilities, maintenance, and any other expenses of the house.  *Id.* ¶ 3.  The daughter could "treat the house as her own"  as long as she did "nothing that would impair or damage" her faither's credit rating, agreed to "refinance the mortgage in her name and become the owner," and impose "no liability or obligation with regard to the house" on her father.  *Id.*  The daughter paid the mortgage payments for the house and invested "substantial sums" on its improvement.  *Id.*  She held an insurance policy in her own name for the contents of the house and continued to paid the premium on a home insurance policy that was in her father's name.  *Id.* ¶¶ 3-4.

After a fire destroyed the house, the daughter used the proceeds from her policy to repay her father $5,500 for the demolition costs, and spent over $10,000 to prepare for rebuilding.  *Id.* ¶ 5.  However, after receiving over $141,000 from the home insurance policy, the father informed his daughter that he would not allow her to rebuild the house.  *Id.* ¶ 6.  He used half of his insurance proceeds to pay off the original mortgage, used the other half to rebuild, then sold his home and moved into the new house.  *Id*.  The father took these actions because he believed that his daughter "demonstrated poor moral character."  *Id.*  He disapproved of his daughter's sex life, stating that she "treated [her] bedroom like

21

it had a revolving door on it." *Id.* ¶ 42. When she had an abortion, it "was the straw that broke the camel's back," and her father vowed that "no way [on] God's green earth would I let her near that house or anything else." *Id.* His actions were "punishment" for his daughter's "moral wrongs." *Id.* The trial court awarded the daughter over $87,000 for the insurance proceeds that the father had kept after she had paid the premiums and the investments she made in the property after the fire, as well as $1,000 in punitive damages and over $17,000 in attorneys' fees for his bad faith conduct. *Id.* ¶ 7.

The Court of Appeals upheld the $87,000 unjust enrichment award, but reversed the punitive damages award because the case did not involve an intentional tort, which Ohio law requires for such an award. *Id.* ¶¶ 24, 37-38. It agreed with the trial court that the father "was vengeful in his decision to keep the excess insurance proceeds and [his daughter's] expenditures for the new home," all of which were motivated by the desire "to punish his daughter for her behavior." *Id.* ¶ 43. Thus, the court affirmed "the trial court's finding of bad faith, i.e., that appellant acted with 'a dishonest purpose, moral obliquity, [and/or] conscious wrongdoing[.]'" *Id.* (quoting *Kalain v. Smith*, 495 N.E.2d 572, 574 n.1 (Ohio 1986)).

In Ohio, a party acts in bad faith if it expresses an intent to be bound by an agreement, but actually harbors the intent to violate its terms and then does so. *Hall v. Frantz*, No. 19630, 2000 WL 670662 (Ohio Ct. App. May 24, 2000). In *Hall*, stockholders in a closely-held corporation reached a settlement agreement to

22

value the corporation solely by the amount of money in its "bank and brokerage accounts, without any consideration for any alleged advances to or funds due to any one party" before awarding each party a proportional share of the assets. The parties agreed to the settlement on videotape. *Id.* at *6. Although he agreed to the settlement, one party subsequently withdrew $177,000 from the accounts, believing that he was entitled to the amount as back wages. *Id.* at *1. He later admitted that, at the time of settlement, "[i]t was in the back of my mind that it was not going to happen," and that he had no intention of valuing the company without first getting credit for his wages. *Id.* at *7. After the other parties filed a motion to enforce the settlement agreement, the trial court awarded attorneys' fees based on the defendant's bad faith failure to comply. *Id.* at *2. On appeal, Ohio's Ninth District Court of Appeals affirmed the award, finding that the defendant's statements was "essentially a confession of his own bad faith." *Id.* at *7. The court further stated:

> Rather than object to the settlement and reassert his right to proceed with arbitration, Frantz announced his intent to be bound by the settlement and then secretly withdrew the funds in violation of that very settlement. It is clear from Frantz' own testimony as to his state of mind before assenting to the video agreement that Frantz did not possess a good faith, albeit mistaken, belief that he was not bound by the videotape agreement. It is the essence of bad faith to manifest intent to be bound by an agreement, meanwhile secretly acting to violate the terms of the agreement.

*Id.*

A final Court of Appeals case to consider is *LEH Properties, Inc. v. Pheasant Run Association*, 2011-Ohio-516, 2011 WL 378783 (Ohio Ct. Ap.. Feb. 7, 2011),

23

which also involved a party's bad faith non-compliance with a settlement agreement.  After the plaintiff filed a motion to enforce an agreement settling a claim that the defendant had breached the parties' property development deal, the defendant first asserted that it could not perform the agreement because a bank refused to release a mortgage on the property.  *Id.* ¶ 24.  It later asserted that "those individuals who participated in the settlement hearing and signed the agreement lacked authority to do so" on its behalf.  *Id.*  However, testimony of its board members revealed that the defendant had actually intended to "drag [] out" the litigation and wear down the plaintiff in the hopes that it "would go broke and go away."  *Id.*  ¶¶ 18-21.  The Ninth District Court of Appeals affirmed the decision to award attorneys' fees to the plaintiff because the defendant's true reasons for failing to comply with the settlement agreement demonstrated its bad faith.  *Id.* ¶ 25.

In addition to the foregoing cases, there is another reason why the Court believes that the Ohio Supreme Court would recognize the exception to the American Rule in question.  After the First District Court of Appeals decided the first of the cases discussed above, *SST Bearing Corporation v. Twin City Fan Company*, it certified to the Ohio Supreme Court a conflict between that decision and those of two other districts on the following issue:  "The 'American Rule' does not permit the prevailing party to recover attorneys' fees in the absence of a statutory authorization.  Does Ohio recognize and exception to the American Rule for 'bad faith' breach of contract in the absence of an award of punitive

24

damages?" Notice of Certified Conflict at 2, *SST Bearing Corp. v. Twin City Fan Co.*, No. 2012-1197 (Ohio Jul. 18, 2012). After "determin[ing] that no conflict exist[ed]," the Ohio Supreme Court declined jurisdiction. *SST Bearing Corp.*, 2012-Ohio-4650, 975 N.E.2d 1207 (table) (Ohio 2012). A subsequent motion for reconsideration failed to convince the Ohio Supreme Court that the conflict existed. *SST Bearing Corp.*, 2012-Ohio-5459, 978 N.E.2d 912 (table) (Ohio 2012). The determination did not, of course, function as an affirmance of the First District Court of Appeal's decision in *SST Bearing Corp. E.g., Village of Brewster v. Hill*, 190 N.E. 766 (Ohio 1934) (stating that "in cases knocking at our door for certification, the refusal of a motion to certify, even if the same legal question is decisively involved, does not furnish an adjudication of the question by this court as an established precedent for future cases"). Nevertheless , Ohio courts may give such a determination "some weight" when evaluating the Court of Appeals decision that prompted the certification of a conflict. *Yerian v. Brinker*, 35 N.E.2d 878, 880-81 (Ohio Ct. App. 1941) (recognizing that the Ohio Supreme Court's dismissal of a conflict "is not equivalent to approval of the principle announced by the Court of Appeals, but it has some weight with us and as the opinion comports with our view of the matter, we accept its pronouncement, although it may be against the rule as announced in many other jurisdictions"). A court may view the determination as "persuasive," or a tacit approval of the lower court's decision. *See Sweeney v. Dispatch Printing Co.*, 42 N.E.2d 940, 940 (Ohio Ct. App. 1942) (recognizing "that this action of the Supreme Court does not make the question

25

presented stare decisis, but it is persuasive in view of the fact that in all probability that court would not change its position upon the same question"). Thus, the Supreme Court's determination that the First District Court of Appeal's decision in *SST Bearing Corporation* was not in conflict with decisions of other Ohio courts provides an additional reason to believe that it might recognize the exception to the American Rule affirmed in that case.

One final tea leaf demonstrating how the Ohio Supreme Court would rule on this issue may by read in *State ex re. Chapnick v. East Cleveland City School District*, 755 N.E.2d 883, 2001-Ohio-1585 (Ohio 2001). In *Chapnick*, a school district failed to give its business manager statutorily required notice of its intent not to reemploy him pursuant to his contract, so he filed suit against the school board. The Court of Appeals issued a writ of mandamus ordering the school board to reemploy him, but denied his request for attorneys' fees. He argued that he was entitled to attorneys' fees as statutory damages for a mandamus action, or because "the board's bad faith necessitated his prosecution of the writ action." *Id.* at 885. The Supreme Court of Ohio rejected both arguments, first holding that the statute did not allow such fees. *Id.* It then rejected his argument for applying the bad faith exception to the American Rule, but only for the reason that he "did not introduce any evidence or argument in the court of appeals to support his contention that the board acted in bad faith." *Id.* It is noteworthy that the Supreme Court did not state that attorneys' fees were not available, as a matter of law, to a party who is subjected to bad faith conduct that causes it to sue to

26

preserve its rights. It must also be conceded that although the school board's breach of the employment contract prompted the mandamus action, *Chapnick* was not a breach of contract case. It therefore must stand for a somewhat broader application of the exception to the American Rule. Nevertheless, *Chapnick* can be read to implicitly assume that the plaintiff might have been entitled to attorneys' fees based on bad faith, but for his failure to demonstrate such conduct in the lower court. Moreover, the conduct in question occurred entirely before he filed suit. Such prelitigation conduct does not, therefore, appear to be outside of the scope of the exception to the American Rule recognized by the Ohio Supreme Court.

As a matter of policy, the City's position that a breach of contract case should not provide the basis for an award of attorneys' fees has substantial appeal. Unless a party agrees to a fee-shifting shifting term, it has no reason to factor liability for the other party's legal expenses into the foreseeable consequences of a breach when entering into a contract, only liability for what was "within the contemplation of both parties at the time of making the contract." *Eckel v. Bowling Green State Univ.*, 974 N.E.2d 754, 768, 2012-Ohio-3164 (Ohio Ct. App. 2012); *see also Hadley v. Baxendale* (1854), 156 Eng. Rep. 145. Furthermore, Courts avoid attributing breach to a moral failure of the breaching party, and have instead developed morally neutral explanations, such as "efficient breach," to explain and even encourage breach when its economic benefits outweigh the costs. *E.g.*, *Stop-N-Go of Madison, Inc. v. Uno-Ven Co.*, 184 F.3d 672, 680 (7th

27

Cir. 1999) ("Because, at least in theory, [efficient] breach makes society better off, the law does not treat it as disfavored"); *see also Patton v. Mid-Continent Sys., Inc.*, 841 F.2d 742, 750 (7th Cir. 1988) (describing liability under contract as "strict liability," because "if the promisor fails to perform as agreed, he has broken his contract even though the failure may have been beyond his power to prevent and therefore in no way blameworthy"). Accusations of moral failure are much more at home in the realm of torts, where many causes of action exist to remedy a party injured by another's willful conduct. In such cases, determinations of a party's subjective intent are almost always a question of disputed fact. Thus, there is a concern that a plaintiff who pleads only a breach of contract claim, prevails on summary judgment based on undisputed facts, and then pursues attorneys' fees based on a theory of bad faith conduct has managed to, in effect, smuggle a tort remedy into a post-judgment proceeding, thereby circumventing what would otherwise be an obligation to prove its claim to a jury. Furthermore, by definition, a finding of bad faith arising from the conduct of the breaching party reflects a moral judgment on its motives and intent. The consequence, an award of attorneys' fees to the prevailing party, is pecuniary and unquestionably punitive. Thus, another concern is that the punitive effect of such an award threatens to make hollow the Supreme Court of Ohio's prohibition on punitive damages in breach of contract cases.

In spite of these concerns, there is room in contract law for moral evaluations of breach. "Not all breaches of contract are involuntary or otherwise

28

efficient.  Some are opportunistic; the promisor wants the benefit of the bargain without bearing the agreed-upon cost, and exploits the inadequacies of purely compensatory remedies." *Patton v. Mid-Continent Sys., Inc.*, 841 F.2d 742, 750 (7th Cir. 1988) (discussing exceptions under Indiana law that allow punitive damages in breach of contract cases).  Based on the foregoing discussion, it is clear that Ohio courts have allowed a prevailing party to recover its attorneys' fees in breach of contract actions where the breaching party's conduct amounted to bad faith.  Accordingly, the Court concludes that the exception to the American Rule on which Plaintiffs base their motions is well-recognized in Ohio, and it will, therefore, consider their arguments for applying it in this case.

### B. Did the City's conduct when breaching the Ready/Return Agreement amount to bad faith?

Plaintiffs argue that the City's bad faith is evidenced by Director Slaybaugh's initial understanding that the City was subject to the 20-year term of the Ready/Return Agreement, his characterization of the agreement as a "bad deal," his admission that he asked the City Attorney "to look for ways . . . to be able to get of that agreement," the City's subsequent unreasonable interpretation of the termination provision in the Ready/Return Agreement, and the refusal to negotiate new Concession Agreements with Plaintiffs, while secretly developing the permit process and not revealing it to Plaintiffs until November, 2012, when it unilaterally terminated the Ready/Return Agreements.  Doc. #82 at 9-15; Doc. #83 at 6-19.

29

The City responds by arguing that the termination provision in the Ready/Return Agreement had more than one reasonable interpretation, and the parties' "honest disagreement" about its interpretation does not rise to the level of bad faith. Doc. #94 at 14-15. Furthermore, Director Slaybaugh was not involved in the original negotiations of the contracts with Plaintiffs, nor were any of the people he worked with. *Id.* at 15-16. Although Director Slaybaugh initially believed that the Ready/Return Agreement had a 20-year term, this understanding changed after reviewing the agreement with the City Attorney and his staff. *Id.* at 17. He did not make any decision about the permit process without the approval of the City Attorney, the City Manager, the City Commission, and the Mayor. *Id.* The City argues that it acted in good faith because it justifiably sought the advice of its attorneys regarding its obligations under the Ready/Return Agreement, did not knowingly breach the agreement, and "immediately agreed to suspend the permit process" when Plaintiffs filed suit. *Id.*

Plaintiffs' Reply Memoranda make the following points: The City's interpretation of the Ready/Return was not reasonable because this Court and the Sixth Circuit have determined otherwise, Doc. #96 at 15; Doc. #97 at 8, and its Response presented a "sanitized account" of the facts without addressing Director Slaybaugh's admission that he asked the City's lawyers to find a way "to get out of" the Ready/Return Agreement. Doc. #97 at 8-9. The meetings with City officials to explain and obtain approval for the permit process were not indicative of good faith because they were secret and off the record. *Id.* at 10-11. Finally,

30

Plaintiffs argue that the City expressly waived any "advice of counsel" defense early in this litigation, when it filed a Motion to Quash the Plaintiffs' subpoena of one of its attorneys, and cannot invoke such a defense now. Doc. #97 at 9 Doc. #96 at 16-17.

With the parties' arguments in mind, the Court turns to the question of whether the City acted in bad faith. Many of the Ohio cases awarding attorneys' fees under the bad faith exception to the American Rule have applied the following definition:

> A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.

*LEH Properties, Inc. v. Pheasant Run Ass'n.*, 2011-Ohio-516, ¶ 23 (Ohio Ct. App. 2011) (quoting *Zaychek v. Nationwide Mut. Ins. Co.*, 2007-Ohio-3297, ¶ 18 (Ohio Ct. App. 2007)). "Moral obliquity means a deviation in one's behavior from the principles of right and wrong or from moral integrity and righteousness." *Dodson v. Maines*, 2012-Ohio-2548, ¶ 41 (Ohio Ct. App. June 8, 2012).

In this case, the facts cited by Plaintiffs lack several of the key elements that Ohio Courts pointed as evidence of a party's bad faith. First, there is no evidence that the City entered into the Ready/Return Agreement with the intent not to honor its terms, which is "the essence of bad faith." *Hall v. Frantz*, No. 19630, 2000 WL 670662 (Ohio Ct. App. May 24, 2000). This was the case in

31

*Hall v. Frantz*, where a party admitted that at the time he agreed to be bound by a settlement agreement, he had the intent not to abide by the very terms he appeared to assent to.  This admission was what colored the act of breaching the agreement, withdrawing money from his partnership accounts, as a breach in bad faith.  The same intent not to be bound motivated the defendant in *Columbus Medical Equiment Co. v. Watters*, who "signed [her] employment contract . . . with no intention of complying with [its] restrictive covenant."  468 N.E.2d 343, 348 (Ohio Ct. App. 1983) (affirming trial court's award of attorney fees based on defendant's bad faith).  Unlike *Hall* and *Watters*, there is no evidence that the City entered into the Ready/Return Agreement without intending to honor its terms.

Another element missing from the evidence of bad faith cited by Plaintiffs is vengefulness, or a desire to do the non-breaching party harm.  The father in *Dodson v. Maines*, 2012-Ohio-2548 ¶ 43 (Ohio Ct. App. June 8, 2012), breached his agreement with his daughter because he was motivated by a desire to "punish" her for her sexual decisions and for having an abortion, leading the Court of Appeals to affirm the attorneys' fee award based on bad faith. The breaching party in *LEH Properties, Inc. v. Pheasant Run Association*, 2011-Ohio-516, 2011 WL 378783 (Ohio Ct. App. Feb. 7, 2011), gave shifting reasons for its nonperformance, but the delay was actually intended to force the non-breaching party into financial ruin.  Plaintiffs have cited to no evidence that any City representative harbored the intent to punish them or cause them financial hardship.

Instead, Plaintiffs stress and repeatedly quote certain admissions of Director Slaybaugh as evidence of bad faith: his belief that the Ready/Return Agreement was a "bad deal" for the City, the admission that he asked the City's attorney "for ways . . . to be able to get out of that agreement," and his initial understanding that the agreement had a 20-year term, which changed after the City adopted the interpretation that the term automatically terminated with the expiration of the Concession Agreements. Slaybaugh Dep. at 481, 447, & 445 (Doc. #51 at 51, 42). Plaintiffs are understandably offended by Director Slaybaugh's admissions, but they do not evidence an intent to do punish them or do them individual harm. They evidence his personal evaluation of the bargain that the City had struck with Plaintiffs, and, at most, intent to breach the Ready/Return Agreement. However, an intent to breach an agreement does not demonstrate bad faith. *E.g.*, *Strategy Group for Media, Inc. v. Lowden*, 2013-Ohio-1330, 2013 WL 1343614 (Ohio Ct. App. Mar. 21, 2013) (holding that mere refusal to perform a contractual obligation of paying amount due on invoices for media work is insufficient to demonstrate bad faith). Furthermore, other portions of Director Slaybaugh's testimony flesh out his motivations in further detail. He believed that the Ready/Return Agreement gave:

> City assets to private companies for twenty years rent free. That's a bad deal.
>
> Q. When you asked your counsel to find a way out of those agreements, the reason you were doing that is because you wanted to find or negotiate a better agreement than what the City presently had, correct?

33

A. Correct. And not only negotiate the agreements, but return a public facility to a public purpose.

Q. You also wanted to obtain more money for the city, correct?

A. That was not -- I was pretty satisfied with the amount of money we were getting from the rental car companies and it was not -- one of my primary motivations was not to get more money. It's a consideration through due diligence to make sure I am living up to my fiduciary responsibility to the public to make sure that we're achieving at least the same amount of money and we're getting compensated for public infrastructure.

Slaybaugh Dep. at 481 (Doc. #51 at 51). These statements significantly mitigate the appearance that he harbored some nefarious purpose when he admitted that he wanted to the City to "get out of" the Ready/Return Agreement. Whether he was correct or not, he believed that it was his responsibility, as a public employee and steward of a public asset, to question how the Ready/Return Agreement impacted the City's resources. This belief does not evidence "a dishonest purpose, moral obliquity, conscious wrongdoing," or any other aspect of bad faith. *LEH Properties, Inc. v. Pheasant Run Ass'n.*, 2011-Ohio-516, ¶ 23 (Ohio Ct. App. 2011) (quoting *Zaychek v. Nationwide Mut. Ins. Co.*, 2007-Ohio-3297, ¶ 18 (Ohio Ct. App. 2007)). If he was incorrect in his assessment of the situation, it was "bad judgment or negligence," but those faults are not enough to amount to a finding of bad faith. *Id.*

Even if Plaintiffs had demonstrated that Director Slaybaugh actually acted in bad faith, a number of the City's agents, including attorneys, the City Manager, members of the City Commission, and the Mayor, all had a part in approving the City's plan to replace the Concession Agreements with the permit process.

34

Director Slaybaugh testified that he is "not the sole arbitrator of decisions at the airport," and that he must "report to other people" in the "approval process," including the City Manager and the City Commission. Plaintiffs would have the Court ignore the involvement of the City's attorneys in approving the interpretation of the Ready/Return Agreement, asserting that "the City has waived any advice of counsel defense it may have had" in this litigation. Doc. #96 at 16. The waiver in question appeared in the Memorandum in Support of the Motion to Quash [the] Subpoena of Attorney Suzanne P. Beck, which stated: "Here, it is important to note that Defendant, the City of Dayton, is not relying upon advice of counsel in this lawsuit. The City of Dayton is relying upon the plain language of the Concession Agreements and Ready/Return Agreements, which are clear and unambiguous and subject to only one interpretation[.]" Doc. #23 at 4. However, at the time the statement was made in support of the City's Motion to Quash, Plaintiffs had not yet filed their Amended Complaints that set forth their intent to seek attorneys' fees based on allegations of bad faith. Although their original Complaints made factual allegations of the City's bad faith, they did not allege that it was the basis for an award of attorneys' fees, nor did they seek such fees in the requested relief. Doc. #1 at 12; Case No. 3:12-cv-405 at Doc. # at 25. Thus, it would be unfair to interpret the City's statement as an "intentional relinquishment" of its right to assert an advice of counsel defense to anything other than the original breach of contract claims stated in Plaintiffs' original complaints. *See D'Ambrosio v. Bagley*, 527 F.3d 489, 495 (6th Cir. 2008) (stating traditional

definition of waiver). Of course, it is no longer possible for the City to mount an affirmative defense to a claim, as it failed to defend itself against Plaintiffs' breach of contract claims with such a defense. Rather, it is now engaged in a post-judgment dispute over whether it breached the parties' agreement in bad faith. The City is not estopped from pointing out to the Court that its attorneys approved the interpretation of the Ready/Return Agreement before it instituted the permit process. The fact affects the Court's analysis of the bad faith issue primarily by further mitigating any showing of Directory Slaybaugh's bad faith, as he testified that he would not have moved forward with the permit process without the approval of the City's attorneys. Slaybaugh Dep. at 450 (Doc. #51 at 43).

Plaintiffs also criticize Director Slaybaugh for "obtain[ing] the pre-approval of the Dayton City Commissioners in a series of secret off-the-record meetings," emphatically describing the meetings as "secret" in their arguments. However, there is no allegation that the City violated a sunshine law with these meetings. Plaintiffs fail to explain why or how they were entitled to participate in non-public meetings between City personnel. Furthermore, they point to no legislative procedure or law the City violated when it passed the ordinance concerning the permit process. For these reasons, there is nothing in the record to support the contention of the Avis Plaintiffs that the City "spurned any semblance of the openness that one might expect of a public entity." Doc. #82 at 15.

Finally, the Court rejects Plaintiffs' argument, as set forth in their Reply Memoranda, that the City cannot now claim that it believed that its interpretation

of the Ready/Return Agreement was reasonable because this Court and the Court of Appeals later concluded otherwise, or that, as a result, the interpretation the City held is evidence of its bad faith. This Court and the Sixth Circuit concluded that the City's interpretation was incorrect and unreasonable, not that it was legally frivolous. Nor did the Sixth Circuit consider the City's appeal frivolous, and described the case as "a routine contract dispute[.]" Doc. #89 at 7. It is too easy now, with the benefit of two court decisions disagreeing with the City's interpretation, to say what single interpretation could have been the only "reasonable" one for any party to have from the beginning of this dispute. As the Supreme Court has stated when evaluating claims of ineffective assistance of counsel under the Sixth Amendment, "it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone*, 535 U.S. 685, 702 (2002) (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)). It would be unfair to judge the City's past position by the standards of legal determinations that had not yet occurred, in a lawsuit that that had not yet begun. Thus, while the City's interpretation of the Ready/Return Agreement was eventually rejected as unreasonable, the interpretation itself cannot be evidence of bad faith conduct.

There is no question that Plaintiffs were harmed by the City's breach. However, all breaches work a harm on the non-breaching party, and a breach alone is not conscious wrongdoing. Director Slaybaugh's intent to free the City from what he saw as a "bad deal" may have been misguided, and there is no question

that the ultimate result has been a costly and protracted ordeal for all parties. However, there is no evidence that he, the City or its representatives harbored a conscious desire to harm Plaintiffs.  In conclusion, there is insufficient evidence of bad faith to justify awarding Plaintiffs their attorneys' fees and non-statutory costs in this matter, and their motions are, therefore, OVERRULED.

III.    **CONCLUSION**

For the reasons set forth above, the Plaintiffs have not demonstrated that the City acted with the requisite bad faith to except this "routine contract dispute" from the American Rule's requirement that all parties must pay their own attorneys' fees and non-statutory costs. *Avis Rent-A-Car, Inc. v. City of Dayton*, No. 13-4101 (6th Cir. 2014) (Doc. #89 at 7).  Accordingly, the Court OVERRULES the Avis Plaintiffs' Motion for Attorneys' Fees [and Non-Statutory Costs] (Doc. #82) and the Enterprise Plaintiffs' Motion for Attorneys' Fees [and Non-Statutory Costs] (Doc. #83).


Date: September 25, 2015

WALTER H. RICE
UNITED STATES DISTRICT JUDGE